[Crim. No. 986.   Fourth Dist.   Oct. 17, 1955.]

THE PEOPLE, Respondent, v. HAROLD RICHARDSON, Appellant.

Harold Richardson, in pro. per., and Spears & Katz, under appointment by the District Court of Appeal, and Joseph A. Katz for Appellant.

Edmund G. Brown, Attorney General, and Joan Gross, Deputy Attorney General, for Respondent.

BARNARD, P. J.—This appellant and one Filley and one Montgomery were jointly charged with the crime of murder, it being alleged that on March 17, 1954, they murdered one Louis Dulisse. They were also charged with three separate counts of robbery alleged to have been committeed on the same day, while armed with deadly weapons. They each pleaded not guilty as to each of the four counts. The defendant Montgomery later withdrew his not guilty plea and entered a plea of guilty. A jury found Richardson and Filley guilty of murder in the first degree, recommending life imprisonment. They were also found guilty on the three counts charging armed robbery. The defendant Richardson has appealed from the judgment, and from an order denying his motion for a new trial. Upon his request for the appointment of an attorney this court appointed the same attorney who represented him at the trial.

The appellant's main contention is that the evidence is insufficient to support the verdict, insofar as connecting him with these crimes is concerned. It is argued that the evidence is insufficient to show that he aided and abetted the commission of these offenses; that the evidence discloses that there was great doubt with respect to his knowledge of, and assistance in, these robberies; and that the mere fact that he was present near the scene of the crime, standing alone, is not sufficient to support the verdict.

Aside from the question as to appellant's participation therein, there is no dispute as to the facts relating to the commission of these crimes. These facts were thoroughly established by many witnesses, including several of the victims and several police officers. About 3 p. m. on March 17, Filley

and Richardson, who lived in Glendora, went to the home of one Coggin in Glendora where they had some wine to drink. Thereafter, the three of them went to El Monte in Richardson's car, a dark blue 1950 Studebaker. On the way to El Monte they talked about robbery and pulling a job, about where it should be done, of the possibility of being hurt, and of what action would take place during a robbery. In El Monte they went to Montgomery's apartment, where they drank some beer. There was further talk of robbery there. They left there about 6:30, Montgomery going with them, and took Coggin home, stopping at a tavern en route. Filley's roommate, Nolan, testified that Filley, Montgomery and Richardson came to his apartment about 7:30 p. m. and remained about 10 minutes. While there, Richardson borrowed Nolan's air force issue shirt and left a bright red one he was wearing. Filley also obtained his gun while there. The three defendants then went to Ontario in Richardson's car. They drove around for a while and when they saw the Casa Blanca Hotel sign Filley told Richardson to stop there. Richardson stopped in front of the hotel and stayed in the car while Filley and Montgomery went in.

Some half dozen guests were playing cards or watching television in the hotel lobby. Filley and Montgomery came in with guns in their hands and herded the guests into a corner with their hands raised. Montgomery ordered them to throw down their money and wallets, which they did. Montgomery picked up some of the money. While Montgomery watched the guests, Filley was trying to break open the cash drawer. While he was so engaged a uniformed officer entered the front door. (It appears that someone notified the police and several cars with officers came within the next few minutes.) When Montgomery saw the officer he left by a side door and ran out and tried to get into a dark car which was driving slowly by. This car, a Buick, was occupied by a man and a woman about 50 years old. Montgomery then turned back toward the hotel, but ran into some officers who handcuffed and held him. As the officers converged on the hotel Filley came out the front door pushing ahead of him the officer who had first entered the hotel, using him as a shield. As they emerged from the door Filley saw Officer Dulisse with a gun in his hand. Filley shot Dulisse twice, causing his death. Just as he fired the second shot one of the officers fired a shot, hitting Filley in the side. Filley dropped to the ground and was handcuffed. A fully loaded gun was found in Montgomery's pocket.

Shortly before the police came two disinterested witnesses saw a dark colored 1950 Studebaker traveling very slowly along the street bordering the hotel, which then turned and proceeded back on the next street at about the same rate of speed.

The appellant testified that he was with the other men on the afternoon and evening of this day; that after driving around in Ontario they saw the Casa Blanca Hotel sign, and Filley told him to stop; that he did so thinking that Filley wanted to get a room; that he watched Filley and Montgomery go in, and waited; that in a minute or so he saw people raising their hands and waited a little longer; that he then got scared and drove away because he did not want to be involved in any trouble; that he drove several blocks, circled around and came back by the hotel; that he then saw some cops around and a "guy" laying on the front porch "so I drove on"; that when Filley and Montgomery went into the hotel he waited outside for four or five minutes; that when he drove away he assumed that a holdup was taking place; that he drove several blocks and then returned to the hotel; and that he came back to see whether or not Filley had actually participated in the holdup.

About two hours later on that same night, a police offcer saw the appellant driving this 1950 dark blue Studebaker in Glendora. The appellant told the officer that he had been seeing a girl friend in San Dimas with Filley and another fellow, and the officer let him go. About 10 minutes later the officer stopped him again and took him to the station where he was booked. In this connection the appellant testified "And I went up, started up to my brother's house and the police in Glendora stopped me. And I knew then that someone had mentioned my name, that I had been implicated in something that had been participated in in Ontario. And then I got to thinking about my job and about my family, and about how serious a crime could be, and I didn't want to be implicated in anything like that——." And also, "So the police stopped me; and after they stopped me I went to my brother's house, and I told him that there had been some kind of trouble in Ontario and if anybody asked him any questions to tell them I was at his house watching television." He further testified that his brother "didn't act like he was too well pleased with me," so he started back home and the police again stopped him and took him to the jail and booked him, and later took him to Ontario. The

appellant admitted that after he was first stopped by the police in Glendora he had also told his sister-in-law that there had been a "holdup" and asked her to tell anyone who asked questions of her that he was at her home watching television during the hours in question.

On March 18, the appellant told the district attorney and several officers that he had not been in Ontario at all on the evening of March 17. On March 23 he told the district attorney and two officers "I pulled up in front of the Casa Blanca Hotel, let these men out on the south side, Filley and Montgomery. One said 'Lets get em.' I knew there was going to be a robbery." These various conversations were taken down by a shorthand reporter. He admitted at the trial that just before the other two entered the hotel he heard one of them say "Lets get em." While he testified that he did not know that a robbery was planned and that he thought the other men were going into the hotel to get a room, he admitted that on a previous occasion when an officer had asked him whether he did not know that the expression "Lets get em" was intended to refer to a stickup, he replied "I certainly knew they were not going to register, I knew that." His testimony on the stand was impeached in many respects by statements he had previously made which had been taken down in shorthand, some of which had been sworn to, including several contradictory statements as to the reason for their going to the hotel on this occasion. On cross-examination he admitted that his previous testimony at the coroner's inquest, to the effect that he was at his brother's house on the night of March 17 from 9 to 11:30 watching TV, was not true.

It requires no extensive analysis of the evidence to show that it was sufficient to support the implied findings that the appellant had knowledge of the purpose of the other defendants in entering this hotel, and that he aided and abetted in the commission of these offenses. In view of the evidence, as a whole, it is not surprising that the jury did not believe his testimony that he did not know that a robbery was planned and that he thought the other men were going into the hotel to get a room. He had been with the other men over a considerable period during which the commission of a robbery was discussed, and it may reasonably be inferred that after driving around in Ontario for a time this hotel was selected for that purpose. Appellant's conduct in waiting, even after he saw that a holdup was in progress, and then driving slowly around and coming back by the hotel strongly indicates that

he was trying to make himself available to assist the others in getting away after the holdup should be completed. It may reasonably be inferred from the evidence that, when Montgomery ran out, after he saw the officer, and went up to a dark colored car which was being driven slowly by, he thought that this car was the one being driven by the appellant and one which he expected to find being made available. The appellant, after he was first stopped by an officer, tried to get his brother and sister-in-law to establish an alibi for him; he first told the officers that he had not been in Ontario that night; and he made a number of statements concerning the transaction which were proved to be untrue. The question of appellant's participation in these crimes was one of fact for the jury and the evidence as a whole, including portions of his own testimony and his contradictory statements and admissions, was sufficient to support the verdict.

Some contention is made that "There does not seem to be any corroboration of any of the accomplices to substantiate the conviction of this appellant." Montgomery was the only accomplice that testified, and there was nothing in his testimony to implicate the appellant except with respect to the admitted facts about these parties being together that afternoon and up to the time the others went into the hotel. The appellant was convicted mainly upon the testimony of witnesses other than Montgomery, and if it be assumed that any corroboration of Montgomery's testimony was necessary it amply appears in the other evidence, including the testimony of the appellant himself.

Finally, it is contended that the court erred in denying the appellant's motions for a separate trial and for a change of venue. No good reason is pointed out in support of these contentions, and we can find none in the record. The defendants were charged with jointly committing these offenses and were properly tried together, in accordance with section 1098 of the Penal Code. The showing made in support of the motion for a change of venue was entirely insufficient to justify or require a granting of that motion, and no error appears in that connection.

The judgment and order are affirmed.

Griffin, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 16, 1955.